# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
### SOUTHERN DIVISION

**RONNELL OLIVER**                                                                 **Plaintiff**

**v.**                                               **Civil Action No.: 1:12-cv-276-LG-JMR**

**AIG LIFE INSURANCE CO.,**
**et al.**                                                                          **Defendants**

### BRIEF IN SUPPORT OF PLAINTIFF'S MOTION
### FOR SUMMARY JUDGMENT

The Plaintiff provides the Court with this Brief in support of his Motion for Summary Judgment.

## I.       Statement of Undisputed Material Facts

1.      The Plaintiff actively worked at Southern Company Services, Inc. or its associate or affiliate ("Southern Company") from July 1985 to September 2008 (Doc. 1 Complaint, ¶4.1, 4.4, 6.3, 6.4, 6.6).

2.      While employed with Southern Company, the Plaintiff was a participant in a Group Accident Insurance Policy, Policy Number PAI 0008063708, with an effective date of January 1, 2004 ("Policy"), which was provided for the benefit of its employees (Exhibit A, p. 46; Doc. 1 Complaint, ¶6.3). The Policy indentifies Southern Company as the Policyholder (Exhibit A, p. 46).

3.      Defendant AIG Life Insurance Co. ("AIG") issued the Policy to Southern Company, insures the Policy, and is responsible for any payment of benefits

made under the Policy (Doc. 1 Complaint, ¶3.2.3; Doc 7 Answer, ¶3.2.3; Exhibit A, p. 52).

4.   The Plaintiff is a member of an eligible class under the Policy (Exhibit A, p. 46; Doc. 1 Complaint, ¶4.1, 4.2, 6.3).

5.   The Policy provides an Accidental Dismemberment Benefit equal to 50% of the Principal Sum for Injury resulting in the loss of one hand or one foot (Exhibit A, p. 56). The Plaintiff has suffered the loss of one foot (Exhibit A, p. 89-92, 96).

6.   The Policy also provides a Permanent Total Disability Benefit equal to 100% of the Principal Sum for Injury resulting in Permanent Total Disability (Exhibit A, p. 75).

7.   The Plaintiff is permanently totally disabled and has been approved for Social Security Disability benefits (Exhibit A, p. 106-108). Furthermore, his treating physician has opined that the Plaintiff is permanently disabled (Exhibit A, p. 96).

8.   The Policy provides a limitation on multiple benefits and states that the maximum amount payable cannot exceed the amount payable for the largest loss (i.e. $200,000) (Exhibit A, p. 55).

9.   The Policy defines "Principal Sum" as the amount of insurance in force under the Policy as described in the Insured's enrollment form (Exhibit A, p.

55). The Principal Sum for the Plaintiff under the Policy is $200,000 (Exhibit A, p. 87; Doc. 1 Complaint, ¶6.1; Doc. 7 Answer, ¶6.1).

10.    The Policy defines "Injury" as bodily injury caused by an accident occurring while this Policy is in force as to the person whose injury is the basis of claim and resulting directly and independently of all other causes in a covered loss (Exhibit A, p. 54).

11.    The Policy defines Permanent Total Disability as permanently unable to perform the material and substantial duties of any occupation for which he or she is qualified by reason of education, experience or training (Exhibit A, p. 75).

12.    On September 7, 2008, the Plaintiff injured his left first toe while clipping his toenail, resulting in trauma and bleeding to the toe (Doc. 1 Complaint, ¶4.3; Exhibit A, p. 239).

13.    The condition of the Plaintiff's toe became progressively worse and his left great toe became gangrenous (Exhibit A, p. 169, 174).

14.    The gangrene began spreading, and as a result of the spread of the gangrene and his deteriorating health, on May 20, 2009, the Plaintiff had his left leg amputated just below the knee (Doc. 1 Complaint, ¶4.3; Exhibit A, p. 174).

15.    As a result of the Plaintiff's partial loss of his leg, on or around April 15, 2010, the Plaintiff filed a claim for both permanent total disability and

accidental dismemberment benefits under the Policy (Doc. 1 Complaint, ¶6.9; Doc. 7 Answer, ¶6.9).

16.   On January 21, 2011, AIG denied the Plaintiff's claim as to both benefits (Doc. 1 Complaint, ¶6.11; Doc. 7 Answer, ¶6.11).

17.   On July 21, 2011, the Plaintiff appealed AIG's decision to deny benefits (Doc. 1 Complaint, ¶6.18; Doc. 7 Answer, ¶6.18).

18.   On April 25, 2012, AIG denied the Plaintiff's appeal and noted that its decision was a final plan administration decision (Doc. 1 Complaint, ¶6.19, 6.21; Exhibit C, p. 1-3).

19.   The Policy provides a three (3) year limitation of actions, or statute of limitations, provision (Exhibit A, p. 60).

20.   The Policy provides that any provision of the Policy which is in conflict with the statutes of the state in which it is delivered should be amended to conform to the minimum requirements of those statutes (Exhibit A, p. 60).

21.   The Policy's 2008 Summary Plan Description contains administrative information which states that legal action alleging breach of fiduciary duty or alleging a statutory violation cannot be commenced until claims and review procedures have been exhausted (Exhibit C, p. 23).

22.    The Policy's 2008 Summary Plan Description also contains administrative information which provides a six (6) month limitation of actions, or statute of limitations, provision (Exhibit C, p. 23).

23.    The Policy's 2009 Summary Plan Description contains administrative information which states that legal action alleging breach of fiduciary duty or alleging a statutory violation cannot be commenced until claims and review procedures have been exhausted (Exhibit C, p. 47).

24.    The Policy's 2009 Summary Plan Description also contains administrative information which provides a six (6) month limitation of actions, or statute of limitations, provision (Exhibit C, p. 47).

25.    The Policy's 2010 Summary Plan Description contains administrative information which states that legal action alleging breach of fiduciary duty or alleging a statutory violation cannot be commenced until claims and review procedures have been exhausted (Exhibit C, p. 97).

26.    The Policy's 2010 Summary Plan Description also contains administrative information which provides a six (6) month limitation of actions, or statute of limitations, provision (Exhibit C, p. 97).

## II.    Legal Issues Raised

A.    Whether the Plaintiff is entitled to injunctive relief requiring AIG to reform its Plan documents due to inaccurate information and notify Plan participants of such reformation.

B.    Whether the Plaintiff may maintain a claim for either Total Permanent Disability Benefits or Accidental Dismemberment Benefits under the Plan at issue.

## III.    Legal Standard on Motion for Summary Judgment

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Therefore, the Court's rule is limited to assessing whether a genuine issue exists as to material facts requiring a trial. *See* Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). The moving party, however, need not negate the elements of the non-movant's case. *See* Wallace v. Texas Tech Univ., 80 F.3d 1042, 1047 (5th Cir. 1996). The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

Once the moving party has met its burden, the nonmoving party bears the burden of designating specific facts showing that there is a genuine issue for trial. *See* Anderson, 477 U.S. at 250. For these purposes, the Court is to construe all reasonable inferences in the non-moving party's favor. Crawford v. Metro. Gov't of Nashville & Davidson County, Tenn., 555 U.S. 271, 274 (2009).

## IV.   Legal Arguments

**A.    The Plaintiff has made a valid claim for injunctive relief under §1132(a)(3).**

**1.    Plan documents contain conflicting limitation of action provisions/ statute of limitation provisions.**

The Policy's 2008, 2009 and 2010 Summary Plan Descriptions[1] all contain language which states the following regarding the time limit for bringing a legal action:

> No legal action, at law or equity, may be commenced later than six months from the date of the final decision of the Plan Administrator (or its delegate) on appeal (or, if no decision is furnished, six months from the final date of the period by which the Plan Administrator is required to provide notification of its determination under Department of Labor regulations).

However, the Policy itself notes the following regarding the time limit for bringing a legal action:

---

[1] There may be other Summary Plan Descriptions that contain similar conflicting language. However, these documents have not been provided to the Plaintiff.

No action at law or in equity may be brought to recover on this Policy prior to the expiration of 60 days after written proof of loss has been furnished in accordance with the requirements of this Policy. No such action may be brought after the expiration of three years after the time written proof of loss is required to be furnished.

Thus, the Policy and Summary Plan Descriptions contain conflicting provisions regarding time limits for legal actions. The Summary Plan Descriptions provide for six (6) months, while the Policy itself allows three (3) years. As a result of this substantial difference in provisions, the Summary Plan Descriptions are misleading to plan participants and contain inaccurate information. Under the recent U.S. Supreme Court case, <u>CIGNA Corp. v. Amara</u>, 131 S. Ct. 1866, 1877-78 179 L. Ed. 2d 843 (2011), the Court made it clear that in the event the Policy and Summary Plan Description contain conflicting information, the terms of the Policy will control. Furthermore, the Summary Plan Descriptions themselves state that "The terms of the applicable Plan document will control in the event of any conflict between the Plan document and any other materials addressing the Plan."

**2.     Plan documents require claimants to fully exhaust administrative remedies, when such is not required by federal law.**

The Policy's 2009, 2010 and 2012 Summary Plan Descriptions all contain language which states the following regarding exhaustion of administrative remedies:

No legal action to recover benefits, to enforce or clarify rights under a plan, or alleging breach of fiduciary duty or alleging a

-8-

statutory violation can be commenced until you have first exhausted the claims and review procedures described below.

The language clearly states no legal actions alleging breach of fiduciary duty or statutory violations[2] may be brought until claims and review procedures have been exhausted. This language is directly contrary to federal law. *See* <u>Galvan v. SBC Pension Benefit Plan</u>, 204 F. App'x 335, 339 (5th Cir. 2006) (noting that breach of fiduciary duty claims do not require administrative exhaustion); <u>Milofsky v. Am. Airlines, Inc.</u>, 442 F.3d 311, 313 (5th Cir. 2006) (noting that fiduciary breach claims do not require exhaustion of administrative remedies); <u>Bass v. Alegis Grp., L.P.</u>, CIV.A. H-04-1652, 2005 WL 3408047 at *6 (S.D. Tex. Dec. 12, 2005) ("Exhaustion of internal plan remedies is not required when an employee alleges a violation of a statutory provision of ERISA, as contrasted with a claim for benefits due under an employee benefit plan.").

### 3.    As a result, AIG should be ordered to reform Plan documents and notify plan participants of such changes.

Given that the Plan's Summary Plan Descriptions conflict with the actual Policy, and conflict with federal law, <u>CIGNA Corp. v. Amara</u>, 131 S. Ct. 1866, 1878, 179 L. Ed. 2d 843 (2011) authorizes the Court to afford appropriate equitable relief. This includes reformation of the terms of the Summary Plan

---

[2] A statutory violation claim would be, in essence, a breach of fiduciary duty claim, rather than a claim for benefits.

Descriptions to remedy false or misleading information. *See* <u>Amara</u>, 131 S. Ct. at 1879. Here, the Summary Plan Descriptions should be revised to reflect a three year limitation on actions, rather than six months, and should further be revised to exclude language indicating that exhaustion is required for breach of fiduciary duty or statutory violation claims.

Furthermore, AIG should be required to provide all plan participants with an updated copy of any applicable revised Summary Plan Description so that such participants are not mislead by erroneous plan documents. *See* <u>Gearlds v. Entergy Servs., Inc.</u>, 709 F.3d 448, 452 (5th Cir. 2013) (finding that *Amara*'s pronouncements regarding available equitable remedies under §502(a)(3) should be followed and held as authoritative); <u>French v. Dade Behring Life Ins. Plan</u>, 906 F. Supp. 2d 571, 584 (M.D. La. 2012) (acknowledging that post-*Amara*, appropriate equitable relief under §502(a)(3) may include contract reformation).

**B.    The Plaintiff has made valid claims for both Permanent Total Disability and Accidental Dismemberment Benefits.**

**1.    Policy requirements for the Accidental Dismemberment Benefit.**

With regard to the Accidental Dismemberment Benefit, it is helpful to individually break down the requirements for the benefit. The Policy states that "<u>If Injury to the Insured Person results</u>, <u>within 365 days of the date of the accident that caused the Injury</u>, <u>in any one of the Losses specified below</u>, the Company will pay

the percentage of the Principal Sum shown below for that Loss....". (*emphasis added*). The Policy further states that "'Loss' of a hand or foot means complete severance through or above the wrist or ankle joint."

First, AIG has not contested that the Plaintiff was an insured person. Indeed, he was an employee of Southern Company and was in a class eligible for the benefit. Second, AIG has not contested that if in fact an injury occurred, it occurred within 365 days of the accident that caused it. The Plaintiff's alleged injury was on September 7, 2008, and the leg amputation resulting from the injury occurred within 365 days, on May 20, 2009. Third, AIG has not contested that there was a "loss" to the Plaintiff that is covered in the Policy. The covered loss was the loss of his left leg, which was amputated well above the ankle joint. Finally, AIG has not contested the amount of the Principal Sum, $200,000, or the amount of the benefit it would be responsible for paying under this provision of the Policy, $100,000.

Thus, the sole issue in this particular claim comes down to whether the Plaintiff suffered an "Injury" as defined by the Policy.

### 2. Policy requirements for the Permanent Total Disability Benefit.

With regard to the Permanent Total Disability Benefit, it is again helpful to individually break down the requirements for the benefit. The Policy states that "If, as a result of an Injury, the Insured is rendered Permanently Totally Disabled within 365 days of the accident that caused the Injury, the Company will pay 100%

of the Principal Sum at the end of 12 consecutive months of such Permanent Total Disability." (*emphasis added*). The Policy further defines Permanent Total Disability as "the Insured is permanently unable to perform the material and substantial duties of any occupation for which he or she is qualified by reason of education, experience or training."

First, AIG has not contested that the Plaintiff was an insured person. As previously noted, he was an employee of Southern Company and was in a class eligible for the benefit. Second, AIG has not contested that the Plaintiff is Permanently Totally Disabled. The Plaintiff presented evidence of disability in the form of Social Security Disability information, as well as medical information from his treating physicians indicating that he was permanently disabled. AIG did nothing to dispute this evidence, and made no assertions that the Plaintiff was not disabled in either of its benefit denial letters.

Third, AIG has not contested that if in fact the Plaintiff is disabled, such disability occurred within 365 days of the accident that caused it. Again, the Plaintiff's alleged injury was on September 7, 2008, and the leg amputation which rendered him Permanently Totally Disabled occurred within 365 days, on May 20, 2009. Fourth, AIG has not contested the amount of the Principal Sum, $200,000, or the amount of the benefit it would be responsible for paying under this provision of

the Policy, $200,000.      Finally, AIG has not contested that the Plaintiff's disability has lasted for 12 consecutive months.

Similar to the Plaintiff's claim for Accidental Dismemberment Benefits, the sole issue in this claim comes down to whether the Plaintiff suffered an "Injury" as defined by the Policy.

### 3.      The Policy has not given AIG discretionary authority to interpret the terms of the Policy.

A plan administrator or other fiduciary's interpretation or application of the plan, including a denial of plan benefits challenged under § 1132(a)(1)(B), is reviewed de novo "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *See* Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 109 (1989); Atkins v. Bert Bell/Pete Rozelle NFL Player Ret. Plan, 694 F.3d 557, 566 (5th Cir. 2012); Hobbs v. Stroh Brewery Co., 189 F. Supp. 2d 559, 566 (S.D. Miss. 2001).

A court cannot imply an administrator's discretionary authority to determine eligibility for benefits or to construe the terms of the plan unless the plan language expressly confers such authority on the administrator. *See* Campbell v. Chevron Phillips Chem. Co., L.P., 587 F. Supp. 2d 773, 787 (E.D. Tex. 2006), *quoting* Chevron Chem. Co. v. Oil, Chem. & Atomic Workers Local Union 4-447, 47 F.3d 139, 142 (5th Cir.1995). Furthermore, the requisite grant of discretionary authority

cannot be inferred from the language of an ERISA plan. *See* <u>Lynd v. Reliance Standard Life Ins. Co.</u>, 94 F.3d 979, 981 (5th Cir. 1996).

In the instant case, the Policy contains no language delegating discretionary authority to the Plan Administrator or to AIG. AIG may argue that the Policy's Summary Plan Description gives it discretionary authority to interpret the terms of the Policy. The 2009 Summary Plan Description has a provision which states:

> **Plan Administrator Discretion**
> The Plan Administrator (or, for insured plans, the insurer) of each plan (or its delegate) has the exclusive discretionary authority to:
> • Interpret the plan;
> • Decide all questions of eligibility for benefits; and
> • Determine the amount of these benefits.
> The Plan Administrator's decisions are final.

However, this provision does not expressly and precisely give AIG any discretion. AIG is not the named Plan Administrator of the Plan. Furthermore, AIG is not specifically identified anywhere in the Summary Plan Description as the "insurer". If the Plan Administrator intended to delegate discretionary authority to AIG, it should have expressly given this authority by naming AIG. However, it did not do so. Here, the Court cannot imply discretionary authority by inferring that the word "insurer" refers to AIG. In fact, the Summary Plan Description covers multiple benefit plans, not just the Group Accident Insurance Policy, some of which contain different insurers.

-14-

Finally, under CIGNA Corp. v. Amara, 131 S. Ct. 1866, 1877, 179 L. Ed. 2d 843 (2011), the terms of statutorily required plan summaries may not be enforced as the terms of the plan itself. The Supreme Court held "For these reasons taken together we conclude that the summary documents, important as they are, provide communication with beneficiaries about the plan, but that their statements do not themselves constitute the terms of the plan for purposes of § 502(a)(1)(B)." *Id.* at 1878. The Court further noted "To make the language of a plan summary legally binding could well lead plan administrators to sacrifice simplicity and comprehensibility in order to describe plan terms in the language of lawyers." *Id.* at 1877-78.

*See also* Koehler v. Aetna Health Inc., 683 F.3d 182, 185 (5th Cir. 2012) (noting that summary plan descriptions provide communication with beneficiaries about the plan, but do not themselves constitute the terms of the plan); Dudley v. Sedgwick Claims Mgmt. Servs. Inc., 495 F. App'x 470, 471 (5th Cir. 2012) ("The distinction between an SPD and a plan matters; the Supreme Court recently clarified that § 1132(a)(1)(B) allows beneficiaries to enforce the terms of a plan but not an SPD."). Therefore, it would be impermissible for the Court to find that the Policy's Summary Plan Description adequately confers discretion when this finding would clearly conflict with the plain language of the Policy itself, which

does not confer discretion, and given the Supreme Court's and Fifth Circuit's decisions that plan summaries may not be enforced as terms of the plan itself.

**4.     The Plaintiff has met the definition of "Injury" under the Policy.**

The Policy defines "Injury", for purposes of both the Accidental Dismemberment Benefit and the Permanent Total Disability Benefit, as follows: "**Injury** - means <u>bodily injury</u> <u>caused by an accident</u> <u>occurring while this Policy is in force as to the person whose injury is the basis of claim</u> <u>and</u> <u>resulting directly and independently of all other causes in a covered loss</u>. (*emphasis added*). The construction of this definition is very important to the case at hand. Admittedly, it is confusing.

The first part of the definition is clear. There must be some type of "bodily injury". AIG has not contested this issue. The "bodily injury" was the Plaintiff's partial loss of his left leg below the knee. The second part of the definition is also clear. The bodily injury must be "caused by an accident." AIG has not contested that there was an accident in this claim. The "accident" was the Plaintiff's overclipping of his left great toe, which eventually resulted in infection and later amputation. It is also clear that the accident caused the injury. Had the Plaintiff not accidentally overclipped his left great toe, infection never would have developed in his left toe and left leg, and his left leg never would have needed to be amputated due to infection. Additionally, there is no doubt that the bodily injury occurred

-16-

while the Policy was in force (e.g. May 20, 2009) and that the Plaintiff's injury is the basis of the claim for benefits.

However, the next phrase, "resulted directly and independently of all other causes", is disputed. The phrase appears to relate to the bodily injury. However, AIG is misinterpreting the provision and claims that it refers to the extent of the immediate harm and does not include all harm flowing from the initial injury. Such a condition is not in the Policy and AIG is wrongfully denying the Plaintiff's claims. If an administrator interprets an ERISA plan in a manner that directly contradicts the plain meaning of the plan language, the administrator has abused his discretion even if there is neither evidence of bad faith nor of a violation of any relevant administrative regulations. *See* <u>Gosselink v. Am. Tel. & Tel., Inc.</u>, 272 F.3d 722, 727 (5th Cir. 2001); <u>Baker v. Metro. Life Ins. Co.</u>, 364 F.3d 624, 630 (5th Cir. 2004). Here, AIG has clearly interpreted the definition of "Injury" in direct conflict with the meaning of the language.

In its initial January 21, 2011 denial letter, AIG claims "that the proximate cause of the left below the knee amputation was directly contributed to by the noted left foot neuropathy, uncontrol1ed diabetes, and peripheral vascular disease affecting the lower extremities.", thereby denying that the accident was the cause of the Plaintiff's leg amputation. AIG's letter further stated "substantial evidence exists that you did not sustain an ***Injury*** as defined by the policy, as the event

leading up to your left below the knee amputation was not independent of all other causes." Again, AIG erroneously concluded that the Plaintiff's accidental over-clipping of his toe was not the only cause of the injury. AIG's April 25, 2012 appeal denial letter came to a similar conclusion, referring back to the same language referenced in the initial denial.

In Dr. Tatiana Sharahy's initial December 2, 2010 "Record Review"[3], which was the primary basis upon which AIG justified its initial decision, she stated "it appears that claimant's left leg amputation was the result of the local trauma to the left great toe (claimant stated he cut the nail back) and its complications, as well as poorly controlled long-standing diabetes and peripheral vascular disease." As a result of this review, AIG claims the accidental over-clipping was not the only cause of the leg amputation. Dr. Sharahy's subsequent December 18, 2011 review on appeal again found that peripheral vascular disease played a leading role in his leg amputation and was the leading cause of the Plaintiff's gangrene.

However, there is no proof that any of the Plaintiff's medical conditions contributed to the cause of his accident. Further, there is no proof that a leg amputation was scheduled or likely to occur outside of the toenail clipping accident. In fact, the only evidence is that "but for" the over-clipping accident, the

---

[3] Dr. Sharahy never performed a personal examination of the Plaintiff or interviewed the Plaintiff or his treating physician.

-18-

amputation would not have occurred. AIG's interpretation creates illusory coverage since it is virtually impossible for there not to be some type of contributing factor as to the extent of an injury after an accident occurs. Unless a person is in perfect health, other factors will play a role post-accident.

It is a well-established principle of law that in evaluating proximate cause one must take the plaintiff as he finds him. *See* <u>Munn v. Algee</u>, 924 F.2d 568, 576 (5th Cir. 1991) (identifying the "eggshell skull" doctrine for pre-existing conditions). For example, if a Plaintiff with an eggshell thin skull accidentally trips and falls, and dies, there has still been an accidental injury, even though he was more susceptible to injury that the average person. However, if that same Plaintiff had an aneurysm that would kill him regardless, and becomes disoriented and trips and falls, the cause of his death would not likely be "accidental".

AIG has completely misconstrued the Policy definition of Injury. The bodily injury (e.g. leg amputation) resulted from only one accidental cause, which was the over-clipping of the toenail. There were not multiple accidental causes of the bodily injury, as AIG suggests. The Plaintiff's neuropathy, diabetes, and peripheral vascular disease had nothing to do with the accident itself. Certainly someone with these particular conditions is more susceptible to greater harm, but that does not allow a Policy to be twisted into a self-serving interpretation. Diabetics are certainly more prone to infections and gangrene. However, apart from an injury,

-19-

such infections may never occur. As previously stated, there was only one accident which caused the injury, and that accident led to the chain of events resulting in leg amputation.

Alternatively, even if it is not entirely clear how the Policy's definition of Injury should be construed, any ambiguities in the Policy or in the definitions must be construed against the drafter, AIG. *See* Todd v. AIG Life Ins. Co., 47 F.3d 1448, 1451-52 (5th Cir. 1995) ("in construing the language of ERISA plans, federal law must follow the rule of contra proferentem, which directs that when plan terms remain ambiguous after applying ordinary principles of contract interpretation, courts are to construe them strictly in favor of the insured.").

*See also* Jones v. Georgia Pac. Corp., 90 F.3d 114, 116 (5th Cir. 1996) ("We have held that in construing ERISA plans we follow the rule of contra proferentem, which dictates that 'when plan terms remain ambiguous after applying ordinary principles of contract interpretation, courts are to construe them strictly in favor of the insured.' (citation omitted). In construing the contract language '[w]e interpret ERISA plans in an ordinary and popular sense as would a person of average intelligence and experience.'"); Dallas Cnty. Hosp. Dist. v. Associates' Health & Welfare Plan, 293 F.3d 282, 288 (5th Cir. 2002); McCall v. Burlington N./Santa Fe Co., 237 F.3d 506, 512 (5th Cir. 2000).

In Walker v. Wal-Mart Stores, Inc., 27 F. Supp. 2d 699, 703 (S.D. Miss. 1998) aff'd, 159 F.3d 938 (5th Cir. 1998), the court quoted the Fifth Circuit in Wise v. El Paso Natural Gas Co., 986 F.2d 929, 939 (5th Cir.1993), noting:

> Where a plan is deemed ambiguous, [T]he ambiguity in the summary plan description must be resolved in favor of the employee and made binding against the drafter. Any burden of uncertainty created by careless or inaccurate drafting of the summary must be placed on those who do the drafting, and who are most able to bear that burden, and not on the individual employee, who is powerless to affect the drafting of the summary or the policy and ill equipped to bear the financial hardship that might result from a misleading or confusing document. Accuracy is not a lot to ask in return for the protection afforded by ERISA's preemption of state law causes of action—causes of action which threaten considerably greater liability than that allowed by ERISA.

Policy language is ambiguous if "a careful reading of the instrument reveals it to be less than clear, definite, explicit, harmonious in all its provisions, and free from ambiguity throughout", or where it is "susceptible of two or more reasonable interpretations, or where one provision is in direct conflict with another provision, or where terms are unclear or of doubtful meaning". *See* Enniss Family Realty I, LLC v. Schneider Nat. Carriers, Inc., 916 F. Supp. 2d 702, 709 (S.D. Miss. 2013); Advanced Solutions Network, Inc. v. Gill, 1:12CV250 LG-JMR, 2013 WL 5278201 at *3 (S.D. Miss. Sept. 18, 2013). If the definition of "injury" does not clearly fall within the Plaintiff's interpretation, then the Policy language is

certainly susceptible to more than one reasonable reading, and as a result, ambiguous.

If the Court finds the definition of "Injury" to be ambiguous or to have multiple readings, it must construe the definition of "Injury" against AIG. For the Court to rule otherwise would be to render the Policy and its coverage completely illusory. A claimant would never be eligible for benefits under the Policy if the Court were to allow AIG's reading of the definition of "Injury". Any minor illness, minor pre-existing condition or minor accident to the claimant subsequent to the accident causing injury could be claimed by AIG to contribute in such a way that the accident is not the sole and independent cause of the injury.

### 5.    No Policy exclusions apply to the Plaintiff's claims.

AIG has further argued that the Plaintiff's loss is excluded due to a Policy provision which states "This Policy does not cover any loss caused in whole or in part by, or resulting in whole or in part from, the following:.... sickness, disease or infections of any kind; except bacterial infections due to an accidental cut or wound, botulism, or ptomaine poisoning....". AIG's denial letter erroneously states "the left below the knee amputation was caused in whole or in part by sickness, disease or infection, which did not directly occur due to an accidental cut or wound." However, AIG has clearly misinterpreted the Policy exclusion. The Plaintiff's loss was solely as a result of his accident. Had the accident not occurred,

he would not have had his left leg amputated. Furthermore, there was direct evidence that the Plaintiff suffered a bacterial infection as a result of his accidental cut, such that the Policy exclusion would not apply.

When the insurer asserts that a policy exclusion applies, it bears the burden of proof in establishing this assertion. *See* <u>Am. Int'l Specialty Lines Ins. Co. v. Rentech Steel LLC</u>, 620 F.3d 558, 562 (5th Cir. 2010); <u>Federated Mut. Ins. Co. v. Grapevine Excavation Inc.</u>, 197 F.3d 720, 723 (5th Cir. 1999). In <u>Rentech</u>, 620 F.3d at 562-63, the court further noted that "if the policy language is ambiguous, we construe it 'strictly against the insurer and liberally in favor of the insured,' (citation omitted), and an 'even more stringent construction is required' where the ambiguity pertains to an 'exception or limitation on [the insured's] liability under the policy....'"). The court went on to stated "Consequently, we must adopt the 'construction of an exclusionary clause ***urged by the insured*** as long as that construction is not itself unreasonable, even if the construction urged by the insurer appears to be more reasonable or a more accurate reflection of the parties' intent.'" ***Emphasis Added.*** *Id.* at 563.

Again, Policy coverage would be illusory if AIG is allowed to claim an exclusion when absolutely any sickness or disease is present in the claimant. This would in effect, allow AIG to refuse coverage 100% of the time based on prior medical status when AIG promised that no proof of insurability was required to

obtain the coverage. It is misleading for AIG to represent to insureds that coverage is available without proof of insurability, accept premiums for such coverage, and then, after a loss, claim that prior medical status excludes coverage.

Finally, AIG never initially disputed that the Plaintiff's gangrene arose from a bacterial infection. It was only on appeal that AIG argued, after receiving Dr. Sharahy's addendum report, that the Plaintiff's gangrene was not bacterial in nature. AIG may not change its reasoning for the initial denial of the claim by asserting post-hoc arguments. When an administrator tacks on a new reason for denying benefits in a final decision, thereby precluding the plan participant from responding to that rationale for denial at the administrative level, the administrator violates ERISA's procedures. Holden v. Blue Cross & Blue Shield of Texas, Inc., CIV.A. H-07-2008, 2008 WL 4525403 at *13 (S.D. Tex. Sept. 30, 2008). In Robinson v. Aetna Life Ins. Co., 443 F.3d 389, 393 (5th Cir. 2006), the court found that the insurer failed to perform a full and fair review of the Plaintiff's claim when it, among other things, initially notified the Plaintiff that his benefits were terminated because it believed he was able to drive, but upon review changed its reasoning and stated that his occupation did not require driving.

*See also* Rossi v. Precision Drilling Oilfield Servs. Corp. Employee Benefits Plan, 704 F.3d 362, 368 (5th Cir. 2013) (holding that the Plan did not substantially comply with the procedural requirements of ERISA when it switched reasons to

deny the claim and stating "it is impossible for the purpose of § 1133 to be fulfilled where the Plan denied Rossi a full and fair review by changing its basis for denial of benefits on administrative appeal."); Grant v. Eaton Disability Long-Term Disability Plan, 797 F. Supp. 2d 732, 737 (S.D. Miss. 2011), *reconsideration granted in part* (Dec. 13, 2011) (giving weight to *Robinson* and finding that the plan violated §1133 when it added an additional reason for denial at the second appeal level).

**6. AIG did not substantially comply with the procedural requirements of ERISA when processing and deciding the Plaintiff's appeal.**

ERISA and the regulations promulgated pursuant to it were intended to help claimants process their claims efficiently and fairly. *See* Schadler v. Anthem Life Ins. Co., 147 F.3d 388, 393 (5th Cir. 1998). 29 U.S.C. §1133 (2) requires that the Plan "afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim." In Lafleur v. Louisiana Health Serv. & Indem. Co., 563 F.3d 148, 156 (5th Cir. 2009), the court noted that under 29 C.F.R. § 2560.503-1(h)(3)(iii), an administrator or insurer cannot rely on the same medical professional's opinion in the initial determination and in the administrative appeal. To do so results in a failure to substantially comply with the procedural requirements of ERISA. Using the same medical professional in both the initial

denial and the appeal denial effectively gives deference to the initial adverse benefit determination in violation of 29 C.F.R. § 2560.503-1(h)(3)(ii). *See Id.* at 156-57.

Additionally, in Crosby v. Blue Cross/Blue Shield of Louisiana, CIV.A. 08-693, 2012 WL 5493761 at *7 (E.D. La. Nov. 13, 2012), the court noted that the regulations specify that a claims review process "will not be deemed to provide a claimant with a reasonable opportunity for a full and fair review of a claim and adverse benefit determination" unless certain procedural requirements are met, as set out in 29 C.F.R. § 2560.503-1(h)(3). Among other things, the court noted that the appeal review must not afford deference to the initial adverse benefit determination and that the health care professional consulted in an appeal may not be the same individual who was consulted in connection with the original determination. *Id.* The court found that, similar to Lafleur, there was a violation that was more than technical noncompliance when the administrator utilized the same physician on both appeals, which resulted in prejudice to the claimant because she did not receive a fully independent appeal. *Id.* at *8.

In the present case, the only medical professional consulted by AIG was Dr. Tatiana Sharahy, who was consulted and utilized on both the initial claim denial and the appeal denial. In fact, Dr. Sharahy's second medical report was simply an addendum to her prior report. This flies in the face of a full and fair review as

-26-

required by ERISA. As a result of AIG's sole reliance on the same medical professional at both levels of the claim, there could not have been a "meaningful review" at the appeal level as required by ERISA.

## V.   Conclusion

In conclusion, there is no genuine issue of material fact in the case and the Plaintiff is entitled to judgment as a matter of law. Therefore, Plaintiff respectfully requests that the Court grant his Motion for Summary Judgment, and further requests that the Court enter an award of attorney's fees and costs in this action.

Respectfully Submitted,

/s Jason E. Burgett
Jason E. Burgett, ASB-5742-A40B

/s David P. Martin
David P. Martin, ASB-3500-M68D

/s Bradley W. Rath
Bradley W. Rath, MSB #100102

Of Counsel:

The Martin Law Group, LLC
2117 Jack Warner Parkway
Suite 1-B
Tuscaloosa, AL 35401
Telephone: (205) 343-1771
Facsimile: (205) 343-1781

Bradley W. Rath, P.L.L.C.
P.O. Box 4604
Biloxi, Mississippi 39531
228-206-1400 Telephone
228-206-1485 Facsimile


## CERTIFICATE OF SERVICE

I hereby certify that on October 3rd, 2013, I electronically filed the

foregoing document with the Clerk of the Court using CM/ECF which will

automatically send notification of such filing to the following:

All counsel of record.

/s Jason E. Burgett
Of Counsel

-28-